UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| MARY L. SCHEETZ, on behalf of plaintiff and the class members described below, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil No. 3:12-CV-811-JD-CAN ) |
| PYOD LLC; RESURGENT CAPITAL SERVICES, LP; ALEGIS GROUP LLC; CAPITAL MANAGEMENT SERVICES, LP; CMS GENERAL PARTNER, LLC; and WELTMAN, WEINBERG AND REIS CO., L.P.A., | ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## OPINION AND ORDER

Now before the Court are the Motions to Dismiss filed by each Defendant in this case. Defendants PYOD, LLC ("PYOD"); Resurgent Capital Services, LP ("Resurgent"); and Alegis Group LLC ("Alegis") filed a Motion to Dismiss on March 4, 2013. [DE 34, 35.] Defendant Weltman, Weinberg and Reis Co., L.P.A. ("WWR"), filed a Motion to Dismiss that same day in which it incorporated and joined the Motion to Dismiss filed by PYOD, Resurgent, and Alegis. [DE 36.] Defendants Capital Management Services, LP ("Capital"), and CMS General Partner, LLC ("CMS"), filed a Motion to Dismiss on March 8, 2013, in which they also incorporated and joined the Motion to Dismiss filed by PYOD, Resurgent, and Alegis. [DE 37.] Plaintiff Mary Scheetz ("Ms. Scheetz") responded to the Motions to Dismiss on March 18, 2013, [DE 38], and Defendants PYOD, Resurgent, Alegis, and WWR filed a reply on March 28, 2013. [DE 39].

While the Motions to Dismiss were pending, Defendants PYOD, Resurgent, Alegis, and WWR filed a Notice of Supplemental Authority. [DE 40.] The Notice of Supplemental

Authority brought to the Court's attention a written opinion regarding similar issues in another case in this District. *Id.* Ms. Scheetz filed a response to the Notice of Supplemental Authority, [DE 42], and Defendants PYOD, Resurgent, Alegis, and WWR filed a reply, [DE 43].

For the following reasons, the Court grants Defendants' respective Motions to Dismiss, while affording Ms. Scheetz leave to replead her claims.

### I. FACTS

Ms. Scheetz is a resident of LaPorte County, Indiana. [DE 1 at ¶ 5.] At some point prior to the filing of this lawsuit, she obtained a credit card from Chase Bank USA ("Chase"), which she used for personal, family, or household expenses. [DE 1 at ¶ 33.] Ms. Scheetz did not pay at least some portion of her credit card balance and that debt became delinquent. [DE 1 at ¶ 35.] At some point after that delinquency, her debt was assigned by Chase to PYOD. *Id.* PYOD is a limited liability company whose business includes taking assignment of—and then collecting on—defaulted consumer debt. [DE 1 at ¶¶ 7–8.] PYOD is one of many debt-buying companies organized under the umbrella name Sherman Financial Group. [DE 1 at ¶ 12.] PYOD is organized under Delaware law and has its principal place of business in Nevada. [DE 1 at ¶ 7.]

PYOD hired Resurgent to service Ms. Scheetz's debt.[1] [DE 1 at ¶ 36.] Ms. Scheetz alleges, on information and belief, that PYOD and Resurgent had a written agreement and power of attorney that allowed Resurgent to take actions in the name of PYOD. [DE 1 at ¶ 18.] She also alleges, on information and belief, that Resurgent directed the collection of her account, even though that action was taken in the name of PYOD. [DE 1 at ¶ 19.]

---

[1] Ms. Scheetz also brings claims against Alegis, the general partner of Resurgent. Ms. Scheetz does not allege that Alegis took any actions with respect to the collection of her debt. Rather, Ms. Scheetz alleges that "As general partner, all acts of Alegis Group, LLC are chargeable to [Alegis]." [DE 1 at ¶ 21.] The Court believes that this paragraph contains a typographical error, and should have read "As general partner, all acts of *Resurgent* are chargeable to [Alegis]." Because Ms. Scheetz clearly identifies Alegis as the general partner of Resurgent, the Court will not construe any typographical error to the prejudice of Ms. Scheetz.

PYOD/Resurgent used Capital to attempt to collect on Ms. Scheetz's delinquent loan.[2] [DE 1 at ¶ 37.] As part of that process, Capital sent Ms. Scheetz a letter dated December 12, 2011. [DE 1 at ¶ 38; DE 1-1.] The letter indicated the current creditor was PYOD and the balance was over $27,000. [DE 1-1.] The letter from Capital apparently did not resolve the delinquency because PYOD/Resurgent retained WWR as counsel to collect on the account. [DE 1 at ¶ 40.] WWR sent Ms. Scheetz a letter dated February 18, 2012, in an attempt to collect on the same delinquent debt. [DE 1 at ¶ 40; DE 1-4.]

These two collection letters give rise to Ms. Scheetz's claims in this case. She filed a Complaint on December 11, 2012, alleging on behalf of herself and a putative class, that the collection efforts violated the Fair Debt Collection Practices Act and Indiana Deceptive Consumer Sales Act. [DE 1.] She also filed a Motion for Class Certification, which is stayed until after the filing of Defendants' answers. [DE 4; DE 11.] In lieu of answering, the Defendants filed the Motions to Dismiss at issue in this Opinion.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint when it fails to set forth a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, the court must decide whether the complaint satisfies the "notice-pleading" standard. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012). The notice-pleading standard requires that a complaint provide a "short and plain statement of the claim showing that the pleader is entitled to relief," sufficient to provide "fair notice" of the claim and its basis. *Id*. (citing Fed. R. Civ. P. 8(a)(2)); *Maddox v.*

---

[2] Ms. Scheetz also brings claims against CMS, the general partner of Capital. Like Alegis, Ms. Scheetz does not allege that CMS engaged in any actions with respect to the collection of her debts. Rather, she alleges that CMS is liable for any acts of Capital, as its general partner. [DE 1 at ¶ 25.]

*Love*, 655 F.3d 709, 718 (7th Cir. 2011) (internal citations omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). In determining the sufficiency of a claim, the Court construes the complaint in the light most favorable to the nonmoving party, accepts all well-pleaded facts as true, and draws all inferences in the nonmoving party's favor. *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010) (internal citations omitted).

The Supreme Court has adopted a two-pronged approach when considering a Rule 12(b)(6) motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). First, pleadings consisting of no more than mere conclusions are not entitled to the assumption of truth. *Id*. This includes legal conclusions couched as factual allegations, as well as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678 (citing *Twombly*, 550 U.S. at 555). Second, if well-pleaded factual allegations are present in the complaint, courts should "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 667. The complaint "must actually suggest that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level." *Maddox*, 655 F.3d at 718 (internal citations omitted). A plaintiff's claim, however, need only be plausible, not probable. *Indep. Trust Corp.*, 665 F.3d at 934 (quoting *Twombly*, 550 U.S. at 556). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id*. In order to satisfy the

4

plausibility standard, a plaintiff's complaint must supply "enough facts to raise a reasonable expectation that discovery will yield evidence supporting the plaintiff's allegations." *Twombly*, 550 U.S. at 556.

Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (internal citations omitted). Factual allegations, however, "that are merely consistent with a defendant's liability . . . stop short of the line between possibility and plausibility of entitlement to relief." *Id.* at 677–78.

### III. ANALYSIS

Ms. Scheetz brings claims against each of the Defendants for violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, and the Indiana Deceptive Consumer Sales Act ("IDCSA"), Ind. Code § 24-5-0.5-1. She alleges that all Defendants violated these statutes by making a false or deceptive representation to Ms. Scheetz in connection with their attempt to collect on her debt. [DE 1 at ¶¶ 67, 75.] The specific deceptive representation she alleges is that that PYOD held itself out as a company entitled to take an assignment of Ms. Scheetz's unpaid consumer debt. *Id.* Her argument, in short, is that in order to take an assignment of any consumer debt from any Indiana debtor, a company must obtain a license under the Indiana Uniform Consumer Credit Code ("IUCCC") or be otherwise excused from that licensing requirement. PYOD lacked such a license (and was not excused from the requirements to obtain a license) and therefore, the argument goes, PYOD's holding itself out as a valid holder of her debt was misleading. The other Defendants allegedly assisted in the collection of Ms. Scheetz's unpaid debt at issue.

5

Each Defendant moves to dismiss the complaint for a variety of reasons. One argument raised by all of the Defendants is that the allegedly deceptive act—the failure of PYOD to hold a license under the IUCCC—was not actually deceptive because the IUCCC does not require PYOD to hold a license in order to take assignment of Ms. Scheetz's debt. This argument affects both counts of Ms. Scheetz's complaint because, if there is no licensing requirement, she has alleged no deceptive representation on which to build a FDCPA or IDCSA claim. For the reasons stated below, the Court agrees that the IUCCC does not require PYOD to hold a license and, therefore, her complaint fails to state a claim upon which relief can be granted.

**A.     IUCCC Licensing Requirements**

The resolution of Defendant's Motions to Dismiss requires interpretation of the IUCCC, which is part of the substantive law of Indiana. When a state's substantive law applies to a plaintiff's claims, this Court's task is to interpret the state's law as it predicts the state's highest court would interpret it. *Bogie v. Rosenburg*, 705 F.3d 603, 609 (7th Cir. 2013). Here, then, the question is whether the Indiana Supreme Court would interpret the IUCCC to require an out-of-state company, such as PYOD, to hold a license under the IUCCC before taking an assignment of consumer debt originally obtained in Indiana.

In interpreting a statute, "[i]f the statutory language is clear and unambiguous, [the Indiana Supreme Court] require[s] only that the words and phrases it contains are given their plain, ordinary, and usual meanings to determine and implement the legislature's intent." *Chrysler Group, LLC v. Review Bd. of Ind. Dep't Workforce Dev.*, 960 N.E.2d 118, 124 (Ind. 2012). Where a statute is susceptible to more than one interpretation, the court will employ other rules of statutory construction. *Basileh v. Alghusain*, 912 N.E.2d 814, 821 (Ind. 2009). One

6

such rule is that the court will consider comments to a uniform act, which "are indicative of the Legislature's intent in enacting a statute based on the uniform act." *Id.* (considering comment to Uniform Interstate Family Support Act in order to interpret statute as enacted in Indiana). Additionally, where an agency is charged with enforcing a particular statute, the Indiana Supreme Court will give deference to that interpretation, deferring to the "agency's reasonable interpretation of such a statute even over an equally reasonable interpretation by another party." *Chrysler Group*, 960 N.E.2d at 124 (granting deference to Indiana Department of Workforce Development in interpretation of statute over which the Department had enforcement powers).

This Court starts, as the Indiana Supreme Court would, with the text of the statute at issue. The licensing requirements of the IUCCC state:

> (1) A person that is a:
>     (a) depository institution;
>     (b) subsidiary that is owned and controlled by a depository institution; or
>     (c) credit union service organization;
> may engage in the making of consumer loans that are not mortgage transactions without obtaining a license under this article.
>
> (2) A collection agency licensed under IC 25-11-1 may engage in:
>     (a) taking assignments of consumer loans in Indiana; and
>     (b) undertaking direct collection of payments from or enforcement of rights in Indiana against debtors arising from consumer loans;
> without obtaining a license under this article.
>
> (3) A person that does not qualify under subsection (1) or (2) shall acquire and retain a license under this article in order to regularly engage in Indiana in the following actions with respect to consumer loans that are not mortgage transactions:
>     (a) The making of consumer loans.
>     (b) Taking assignments of consumer loans.
>     (c) Undertaking direct collection of payments from or enforcement of rights against debtors arising from consumer loans.
>
> (4) A separate license under this article is required for each legal entity that engages in Indiana in any activity described in subsection (3). However, a

7

> separate license under this article is not required for each branch of a legal entity
> licensed under this article to perform an activity described in subsection (3).

Ind. Code § 24-4.5-3-502. Ms. Scheetz has alleged that PYOD is not an entity covered by Section 1 and that it did not hold, at the time, a license to work as a collection agency under Section 2. [DE 1 at ¶¶ 47, 49.] Therefore, the question of whether PYOD was required to obtain a license under the IUCCC to take an assignment of a consumer loan depends on whether it "regularly engage[d] in Indiana" in the actions described in Section 3.

The statute does not define the term "regularly engage in Indiana" and the Court cannot locate any case from the Indiana Supreme Court or Indiana Court of Appeals interpreting that clause in this context. However, PYOD argues that the statute should not be interpreted to require it to hold a license under the IUCCC on the basis of (1) statutory commentary and (2) the manner in which the statute has been interpreted by the Indiana Department of Financial Institutions ("DFI"). The Court will consider each in turn.

### 1. Commentary to the IUCCC

As noted above, Ms. Scheetz bases her claim regarding the requirement to obtain a license on section 24-4.5-3-502 of the Indiana Code. Section 3-502 is a part of the IUCCC, which was enacted in Indiana based on the Uniform Consumer Credit Code, as promulgated in 1968. Indiana section 3-502 corresponds to section 3-502 of the 1968 Uniform Code.[3] The commentary to Uniform Code section 3-502 states, in part: "Out-of-state lenders who make loans through the mail normally will not be subject to the licensing requirement if the evidence of debt is received by the lender out of this State. An out-of-state lender who opens a loan office in this

---

[3] In her Response to Defendants' Notice of Supplemental Authority, Ms. Scheetz states that section 3-502 of the IUCCC is based on the section 2-301 of the 1968 Uniform Act. [DE 42 at 9–10.] However, Ms. Scheetz seems to confuse the 1968 Uniform Consumer Credit Code with the 1974 Uniform Consumer Credit Code (where, after subsequent revisions, the analogous section is found at section 2-301). Since Indiana's enactment of the statute was based on the 1968 Uniform Code, the Court will look to the comments from the 1968 Uniform Code to determine how the Indiana Supreme Court would interpret the statute.

8

State at which evidence of debt for [consumer] loans is received must be licensed." Unif. Consumer Credit Code (1968) § 3-502 cmt. 2 (citation omitted).

Other sections of the IUCCC contain similar commentary which bars the application of the statute to out-of-state businesses. For example, section 6-201 of the IUCCC relates to the requirement that certain businesses file a notification with the DFI before engaging in certain activities in Indiana. One such regulated activity is "[t]aking assignments of rights against debtors that arise from sales, leases, or loans by a person having an office or a place of business in Indiana." Ind. Code § 24-4.5-6-201(1)(b). The commentary to that section in the Uniform Code states, in part: "Assignees of consumer obligations must file notification under Section 6.202 only if all of the three following elements are present: (1) the assigned obligations arose out of sales, leases or loans made in this State, (2) the assignee has an office or place of business in this State, and (3) the assignee undertakes direct collection of payments from the debtors or direct enforcement of obligations against debtors. An assignee having no office or place of business within this State is not required to file notification even though he is engaged in direct collection or direct enforcement of consumer accounts in this State." Unif. Consumer Credit Code (1968) § 6-201 cmt. 2.

The commentary seems to indicate a legislative intent not to apply the IUCCC to companies physically located outside of Indiana. However, Mr. Scheetz raises two arguments against the application of the commentary in this case. First, she argues that the commentary is a comment to the Uniform Consumer Credit Code and not the actual commentary of the Indiana legislature. [DE 38 at 4–5.] Second, she argues that the statute has been subsequently amended

9

and the current version "makes no reference to an exemption for debt buyers or lenders." [DE 38 at 5.]

Her first argument is foreclosed by the fact that Indiana courts do consider the commentary to the Uniform Code as indicative of the intent of the Indiana legislature in enacting the Uniform Code. *Basileh*, 912 N.E.2d at 821.

With respect to her second argument, Ms. Scheetz is correct that section 3-502 has been amended several times since its original enactment. The majority of those amendments do not speak to the extraterritorial application of its licensing provisions. *See* Ind. Pub. L. 122-1994 § 24 (amending statute to be gender neutral); Ind. Pub. L. 10-2006 § 6, 57-2006 § 6 (amending statute to engage in cosmetic rewriting). However, one amendment seems to signify an intent to limit application of the statute as to out-of-state entities. Specifically, in 2000, the legislature changed the licensing requirements from applying to any entity that "engaged[d] in this state in the business of" the listed activities, to applying the licensing requirements to any entity that "*regularly* engage[d] in this state" in those activities. Ind. Pub. L. 23-2000 § 7 (emphasis added). The fact that the legislature increased the required nexus to the state—requiring more contact with Indiana before a license is required—evidences a legislative intent consistent with the opinions expressed in the Uniform Code commentary (rather than inconsistent with that commentary, as Ms. Scheetz argues).

Accordingly, the Court predicts that the Indiana Supreme Court would consider as persuasive the Uniform Code commentary expressing that section 3-502 did not intend to require an out-of-state company to obtain a license under the IUCCC.

## 2. Agency Interpretation of the IUCCC

The IUCCC grants the DFI broad powers of enforcement, interpretation, and oversight with respect to the IUCCC. For example, the definitional section of the IUCCC states: "A reference to a requirement imposed by this article includes reference to a related rule or guidance of the [DFI] adopted pursuant to this article." Ind. Code § 24-4.5-1-102(3). Further, the IUCCC grants the DFI the power to "counsel persons and groups on their rights and duties" under the IUCCC, "adopt, amend, and repeal rules, orders, policies, and forms to carry out the provisions of this article," and exempts from liability any act taken in conformity with a rule, written opinion, or written interpretation of the DFI. Ind. Code § 24-4.5-6-104(1)(b), (1)(e), (2).

Defendants point to several written interpretations from the DFI that relate to the need for an out-of-state company to obtain a license under the IUCCC. Documents titled "Loan License Requirements," dated July 1, 2010, and July 1, 2012, respectively, each state: "Assignees need a loan license if they are based in Indiana and take assignment or undertake direct collection of consumer loans that were made in Indiana." [DE 35-1 at 1–2.] A document titled "IUCCC Annual Reporting Information" states:

> Out-of-State companies granting consumer credit to Indiana consumers are required to file under the IUCCC if:
> 1. They have an Indiana location or the sale, lease, or loan is closed in Indiana by their agent.
> 2. If assignments are taken and direct collections are undertaken at a location in Indiana on sales, leases, or loans.

[DE 35-1 at 4.] Additionally, a document titled "Indiana Uniform Consumer Credit Code Filing Information" states:

> Out-of-State companies granting consumer credit to Indiana consumers are required to file under the IUCCC if:
> 1. They have an Indiana location.
> 2. The sale or lease is closed in Indiana by their agent.

> 3. If assignments are taken and direct collections are undertaken in Indiana on their sales or leases."

[DE 35-1 at 6.] These written notices by the DFI are properly before the Court on a motion to dismiss as evidence of the agency's interpretation of the statute at issue in this case. *See Travelers Cas. & Sur. Co. of Am. v. Adecco USA, Inc.*, No. 2:12-CV-416, 2013 WL 4776771, at *2 (N.D. Ind. Sept. 5, 2013) (agency publications from EEOC properly before district court on motion to dismiss).

The DFI interpretations evidence a consistent agency interpretation that a physical presence in Indiana is required before an IUCCC license must be obtained. Ms. Scheetz objects to the consideration of these interpretations on several grounds. First, she argues that the "Loan License Requirements" issued by the DFI do not apply here because PYOD was not a lender and therefore should not be concerned with the requirements to obtain a "loan license." [DE 38 at 6–7.] Second, she argues that the conclusion that PYOD does not require a license does not follow from the statements contained in the DFI's interpretations. [DE 38 at 7–8.] Third, she argues that the interpretations cited were not promulgated through a formal rulemaking process. [DE 38 at 8–10.]

With respect to Ms. Scheetz's first argument, regarding a "loan license," the IUCCC does not create multiple types of licenses that might be obtained depending on the circumstances. Rather, section 3-502 creates a single type of license created under the IUCCC. Section 3-502 does exclude from its licensing requirement any entity that is a depository institution, subsidiary that is owned or controlled by a depository institution, credit union service organization, or licensed collection agency. Ind. Code § 24-4.5-3-502(1)–(2). To the extent that Ms. Scheetz argues that PYOD should have been licensed as a collection agency, the IUCCC does not speak

to a requirement to obtain a collection agency license. Such a requirement would be found in chapter 25-11-1 of the Indiana Code, which covers the licensing of collection agencies (and which does not appear in Ms. Scheetz's complaint).[4] Because there is only one license created by the IUCCC, any discussion by the DFI of a license required by the IUCCC—whether or not DFI titles it a "loan license"—must necessarily refer to the licensing requirement of section 3-502.

As to her second argument, Ms. Scheetz argues that the interpretations discussed above are confusing at best and do not stand for the conclusion that PYOD required no license under the IUCCC. This argument relies on the same false distinction between a license and a "loan license," which does not appear in section 3-502.[5]

Finally, she argues that the interpretations should be afforded no deference by this Court because the interpretations were not issued through a formal rulemaking process. First, Indiana courts do not require an agency interpretation to be promulgated as a formal agency rule before granting it deference. *See Ind. Ass'n of Beverage Retailers, Inc. v. Ind. Alcohol and Tobacco Comm'n*, 945 N.E.2d 187, 195 (Ind. Ct. App. 2011) (considering longstanding practices of agency as evidence of agency's interpretation of statute). Further, the Court notes that the DFI's authority under the IUCCC is broad and not limited to official rulemaking under the Indiana

---

[4] Ms. Scheetz does argue that "Most buyers of Indiana defaulted debt secure a collection agency license rather than a loan license." [DE 38 at 7.] This, however, is not sufficient to state a claim that PYOD needed to obtain such a license.

[5] In support of this argument, Ms. Scheetz attaches a series of communications between the DFI and representatives of debt buying companies, which Ms. Scheetz obtained through a FOIA request. While she argues that these exchanges help her position, the DFI responded to a request for clarification from an attorney for a debt buying company with the following answer: "Does a debt buyer that is an out-of-state corporation which has its principal place of business in a state other than Indiana need a license under the IUCCC to take an assignment of a consumer loan? No." [DE 38-2 at 21.] Fortunately for Ms. Scheetz, unlike the DFI interpretations offered by Defendants, this exchange is not a published opinion of the agency, so it is afforded much less weight. The Court notes that it would reach the same decision on Defendants' Motions to Dismiss even if it did not consider the DFI email correspondence found in DE 38-2.

Administrative Agency Act. Specifically, the IUCCC allows the DFI to "counsel persons and groups on their rights and duties" under the IUCCC and exempts from liability those who act in conformity with that guidance. Ind. Code § 24-4.5-6-104(1)(b), (2). The very act of providing individual guidance is incompatible with a formal, universally applicable rulemaking process. This shows that the legislature's intent could not have been to require all such interpretation to flow through the formal requirements of the Indiana Administrative Agency Act.

Accordingly, the Court predicts that the Indiana Supreme Court would afford great deference to the DFI's interpretation that the IUCCC is not intended to require a license for an out-of-state company with no physical location in Indiana, such as PYOD.

**3. Conclusion**

Based on its deference to the legislative intent, as expressed in the commentary to the Uniform Consumer Credit Code, and to the interpretation of the IUCCC by the Indiana DFI, the Court predicts that the Indiana Supreme Court would interpret the licensing provisions of the IUCCC not apply to an out-of-state assignee of debt, such as PYOD.[6] In further support of this conclusion, the Court notes that it is aware of two other cases in which substantially similar claims have been raised; in both cases, the deciding court reached the same decision reached by the Court in this case. *Havens v. Portfolio Investment Exchange, Inc.*, No. 3:12-v-671 (N.D. Ind. Aug. 15, 2013) [DE 40-1]; *Asset Acceptance, LLC v. Wertz*, No. 71D05-1208-CC-607 (Ind. Super. Ct. Mar. 18, 2013) [DE 39-1]. Because this licensing requirement is the basis of the

---

[6] The Defendants raise several other arguments, including that the IUCCC exempts from liability action taken in conformity with written notices by the DFI (which is what Defendants argue they did in this case), [DE 35 at 6–7], that the IUCCC would violate the Commerce Clause if interpreted in the manner suggested by Ms. Scheetz, [DE 35 at 8], and that the FDCPA cannot be used as an enforcement mechanism for violations of state law, [DE 35 at 11–14]. However, because the Court predicts that the Indiana Supreme Court would not find a requirement for PYOD to hold a license under the IUCCC, the Court need not reach those arguments in this opinion.

allegedly deceptive representations in both counts of Ms. Scheetz's complaint, the Court finds that both of her claims fail to state a claim upon which relief can be granted.

**B.     Leave to Amend**

Federal Rule of Civil Procedure 15(a)(2) entrusts to the Court's discretion the decision of whether to permit a party to amend its pleading after the initial stages of litigation, and instructs the Court to "freely give leave when justice so requires." *See Orix Credit Alliance, Inc. v. Taylor Mach. Works, Inc.*, 125 F.3d 468, 481 (7th Cir. 1997). Thus, the Court will generally grant leave to amend unless one or more of three conditions exist: (1) the party seeking amendment has engaged in undue delay or some sort of bad faith; (2) the opposing party would suffer undue prejudice; or (3) the amendment would be futile. *Id.* While Defendants ask that the Court dismiss the claims in this case with prejudice, there is no evidence of bad faith or undue prejudice and the Court cannot definitively conclude at this stage that amendment would be futile.

## IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motions to Dismiss [DE 34; DE 36; DE 37]. The Court affords Ms. Scheetz until **October 28, 2013** to file an amended complaint consistent with this opinion. The Court **DENIES** as moot Ms. Scheetz's pending Motion for Class Certification [DE 4], with leave to re-file for class certification based on her amended complaint, if she chooses to file one.

SO ORDERED.

ENTERED:  September 26, 2013

                                                /s/ JON E. DEGUILIO
                                                Judge
                                                United States District Court